No. 99-078

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 125

299 Mont. 477

2 P. 3d 245

DECKER COAL COMPANY,

Petitioner and Appellant,

v.

THE DEPARTMENT OF REVENUE OF THE

STATE OF MONTANA and THE STATE TAX

APPEAL BOARD OF THE STATE OF MONTANA,

Respondents and Respondents.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Big Horn,

The Honorable Susan Watters, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Joseph E. Jones (argued) and Lon A. Licata; Fraser, Stryker,

Vaughn, Meusey, Olson, Boyer & Bloch, Omaha, Nebraska

Terry Cosgrove; Crowley, Haughey, Hanson, Toole & Dietrich,

Helena, Montana

For Respondents:

David W. Woodgerd, Chief Tax Counsel, Milo M. Vukelich, Lawrence G. Allen (argued) Tax Counsel, Special Assistant Attorneys General, Helena, Montana

_____

Submitted: October 22, 1999

Decided: May 9, 2000

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 This is an appeal from the December 1, 1998 order of the Montana Thirteenth Judicial District Court, Big Horn County, on a Petition for Judicial Review, affirming the State Tax Appeal Board's order assessing additional coal taxes against Decker Coal Company (Decker). We reverse the order of the District Court.

### *Procedural Background*

¶2 The Department of Revenue of the State of Montana (DOR) conducted three separate audits and assessments of Decker for the years 1987 through 1992. On April 17, 1992, DOR assessed additional taxes and interest against Decker for coal taxes for the years 1987 through 1988. Decker timely filed an objection to the assessment before the DOR Division Administrator. On April 14, 1994, DOR assessed additional taxes and interest against Decker for coal taxes for the years 1989 through 1990. Both assessments were consolidated before the DOR Division Administrator. The DOR Division Administrator

denied Decker's appeal from the 1987-1990 tax assessments. Decker appealed that decision to the DOR Director. The Director denied the appeal. Decker then appealed the Director's decision to the State Tax Appeal Board (STAB). Decker also filed an interlocutory appeal requesting the District Court to define "market value" and "arm's length agreement." On January 25, 1996, Judge Baugh issued an order defining "market value," for purposes of § 15-35-107(1) and (3), MCA, as the price a willing buyer would pay to a willing seller under the market and economic conditions at the time of the sale. Neither Decker nor DOR appealed from that decision.

¶3 On April 30, 1996, DOR assessed additional taxes and interest for coal taxes for the years 1991-92. Decker appealed this assessment. That appeal was also denied. Decker then appealed the 1991-92 coal tax assessments to STAB. The appeals from the 1987-90 assessment and the 1991-92 assessment were consolidated. The parties filed cross-motions for summary judgment before STAB. STAB denied Decker's motion for summary judgment and granted DOR's motion. Decker filed a petition for judicial review of STAB's decision. The District Court determined that STAB had not included Findings of Fact and Conclusions of Law in the manner and form required and remanded to STAB for such findings and conclusions.

¶4 On September 15, 1997, STAB issued Findings of Fact, Conclusions of Law, and an Order. Again concluding that STAB had failed to include Findings of Fact and Conclusions of Law as required, the District Court remanded to STAB once more for appropriate Findings of Fact and Conclusions of Law. On February 6, 1998, STAB issued Findings of Fact and Conclusions of Law and an Order affirming DOR's assessment of additional coal taxes against Decker. Decker petitioned for judicial review. On December 1, 1998, Judge Watters entered an Order and Memorandum affirming STAB's Third Order. Decker appeals from that decision.

### Factual Background

¶5 The following are undisputed facts as set forth by the parties in their respective briefs. Decker owns and operates a coal mine in Montana (hereinafter referred to as the Decker mine). Decker, Black Butte Coal Company (Black Butte) and Big Horn Coal Company (Big Horn) all entered into contracts in the mid-1970s with Commonwealth Edison (ComEd) for the long-term delivery of coal. Under the terms of those contracts, each of these entities was to supply ComEd with coal at a base price that would be adjusted over time by a predetermined escalator. During the audit period of 1987-1992, the base price

plus escalators on the Decker/ComEd contract computed to a price of roughly $24-$28 per ton.

¶6 Three contracts for the sale of coal are at issue in this appeal: (1) a  contract entered into on December 31, 1986 between Decker (seller) and Big Horn (buyer) for the sale of coal by Decker during 1987; (2) a contract entered into on December 31, 1987 between Decker (seller) and Big Horn (buyer) for the sale of coal from 1988 through 1992; and (3) a contract entered into on January 1, 1988 between Decker (seller) and Black Butte (buyer) for the sale of coal during the years 1988 through 1992 (collectively referenced herein as the Montana Contracts).

¶7 The price of coal sold by Decker to Big Horn and Black Butte for the relevant audit years 1987 through 1992 under the Montana Contracts ranged from approximately $7.50 per ton to $10.42 per ton. For the coal that Decker sold to Black Butte and Big Horn under the Montana Contracts, Decker timely reported and paid to the State of Montana $8.5 million in coal taxes on the full contract price.

¶8 The Montana Contracts followed from the decision of Black Butte and Big Horn, both Wyoming entities, to exercise their rights under separate coal purchase contracts, negotiated between themselves and ComEd in the 1970s (hereafter the Wyoming Contracts). Black Butte and Big Horn apparently had the contractual right under the Wyoming Contracts to buy or "outsource" coal from an alternate source rather than mine the coal themselves. Exercising their right to outsource the coal, Black Butte and Big Horn contracted to purchase coal from Decker on the condition that ComEd contemporaneously purchase that coal from them. The coal purchased by Big Horn and Black Butte from Decker was shipped by Decker to ComEd to fulfill the contractual obligations of Big Horn and Black Butte under the Wyoming Contracts. Decker did not receive any additional money or other consideration of any nature from Big Horn or Black Butte for the coal when it was resold to ComEd under these separate Wyoming Contracts.

¶9 At the time of the Montana Contracts, Peter Kiewit Sons', Inc. (Kiewit) directly or indirectly through its subsidiary Kiewit Mining Group (KMG), had ownership in Decker, Big Horn and Black Butte. Decker was a 50/50 Montana joint venture between KMG and Western Minerals, Inc., a wholly separate entity owned by Nerco, Inc. (NERCO). Black Butte was a 50/50 Wyoming joint venture between KMG and Bitter Creek Coal Company, a wholly separate entity owned by Union Pacific Corporation. Big Horn was a Wyoming Corporation and wholly owned subsidiary of Kiewit.

¶10 Negotiation of the Montana Contracts between Decker and Big Horn and Decker and Black Butte took place principally between Donald Sturm of Kiewit (on behalf of Big Horn and Black Butte) and Gerald Drummond of NERCO (on behalf of Decker).

¶11 A majority of Decker's management committee, comprised of an equal number of persons designated by Kiewit and NERCO, must authorize sales of coal made by Decker. NERCO, Kiewit's partner in Decker, was a competitor of Kiewit and knowledgeable about the coal market conditions from 1986 through 1988.

¶12 DOR has audited all major coal producers in the state of Montana from 1987 through 1990, but is unaware of any prices paid to Montana coal producers under coal contracts entered into from 1987 through 1990 that exceeded the approximately $7.50 to $10.42 per ton that Decker received from Big Horn and Black Butte under the Montana Contracts. The prices paid to other coal producers for contracts negotiated and entered between 1986 and 1989 ranged from $5.13 per ton to $8.70 per ton.

¶13 The following are comparable long term coal contracts that were negotiated and entered into during much the same time period as the Montana Contracts at issue:

| Date | Seller | Buyer | Selling price $/ton |
|------|--------|-------|---------------------|
| 04/89 | ARCO | LCRA | $5.25 |
| 11/87 | Spring Creek | Detroit Edison | $6.51 |
| 01/88 | Western Energy | Wisconsin P&L | $8.70 |
| 08/89 | Peabody Rochelle | LCRA | $5.00 |

¶14 DOR did not conduct a market value study nor did it determine the market value of coal for contracts entered into from 1986 through 1988. Rather, DOR imputed a price of roughly $24 to $28 per ton to the Montana Contracts based solely upon prices negotiated under a contract entered into on June 20, 1974 between Decker (seller), and ComEd (buyer), a Chicago, Illinois-based electric utility (hereafter the 1974 ComEd Contract). The coal prices under the 1974 ComEd Contract (as adjusted by predetermined escalators) for coal sold during the audit period were not intended to and did not follow market value prices.

## *Standard of Review*

¶15 The parties do not dispute the Findings of Fact in STAB's order of February 6, 1998. Rather, they dispute the application of those facts to the law as set forth in § 15-35-107, MCA, and in Judge Baugh's Interlocutory Order of January, 1996. Decker appeals from the District Court's conclusion that STAB and DOR correctly interpreted the law in imputing market value to the coal contracts in question. Thus, resolution of this appeal involves questions of law that are to be reviewed for correctness rather than the clearly erroneous standard applicable to an agency's finding of fact. *See* Steer, Inc. v. Dept. of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.

## *Issues Presented*

¶16 Pursuant to § 15-35-107, MCA, DOR may impute a value to coal sales rather than relying on contract prices if (1) it determines the contract price does not represent an arm's-length agreement; <u>and</u> (2) the imputed value approximates market value. Thus, the questions presented for this appeal are:

¶17 1.  Whether Decker has an arm's-length relationship with Wyoming coal producers, Big Horn and Black Butte?

¶18 2.  Whether the $24-$28 per ton value that DOR imputed to the contracts approximates market value?

¶19 Since we determine that resolution of issue number two is dispositive, we do not address issue number one.

## *Introduction*

¶20 Section 15-35-107, MCA, provides as follows:

> **When value of coal may be imputed -- procedure.** (1) The department may or shall at the request of the taxpayer impute a value to the coal which approximates market value f.o.b. mine in a case where:
>
>   . . .

(c) a person sells coal under a contract which is not an arm's-length agreement[.]

¶21 In order to impute a value to coal sales under § 15-35-107(1)(c), MCA, DOR must meet a two-part standard: it must determine that the contract price does not represent an arm's-length agreement and that the transaction is less than market value. The two criteria are stated in the conjunctive. Thus, if DOR fails to satisfy either standard, DOR may not impute a value to the coal sales in question. Since we determine that Decker has shown that DOR's imputed value does not "approximate" market value under the market and economic conditions pertaining in 1986-1988, we need not address the question of whether the sales were arm's-length.

¶22 In his interlocutory order, Judge Baugh defined "market value" as follows:

The term "market value" as set forth in Sec. 15-35-107(1) and (3), M.C.A., means the price that a willing buyer would pay to a willing seller under the market and economic conditions at the time of sale.

Department of Revenue's Contentions:

¶23 DOR contends that there was no need to conduct a market value study; rather, the best indicators of value for the coal at issue are the actual sales of coal mined by Decker in the 1980s and sold to ComEd pursuant to the 1974 contract between ComEd and Decker. The record contains examples of such sales that occurred between Decker and ComEd, Black Butte and ComEd, and Big Horn and ComEd at prices between roughly $24 and $28 per ton.

¶24 DOR argues that in imputing value, § 15-35-107(3), MCA, allows DOR to apply factors used by the federal government under 26 U.S.C. § 613 and 26 C.F.R. § 1.613-41, including the taxpayer's sales of ores or minerals of like kind and grade. DOR may also consider any other additional criteria it considers appropriate.

¶25 DOR contends that, when applying the factors from the above IRS regulation, the representative market price is established by the coal sold to ComEd under the 1974 ComEd Contract. The assessments of Decker were appropriately based upon that 1974 arm's-length contract.

¶26 In summary, DOR contends that this appeal involves Decker coal that is mined at Decker, loaded on the train at Decker, shipped directly to ComEd, and never touched by

Black Butte or Big Horn. As characterized by DOR, when the coal comes down the conveyor belt at the Decker mine, it is purchased by Big Horn and Black Butte and resold to ComEd before it hits the railroad car. DOR posits that Decker cannot use this "paper sham" transaction to contract away its tax obligation on coal that is mined in the state of Montana.

Decker's Contentions:

¶27 Decker contends that DOR's imputed price of $24-$28 per ton, based upon the 1974 ComEd Contract, has no reasonable relationship to the undisputed market price of coal during the period when the Montana Contracts were negotiated. The 1974 ComEd Contract was negotiated over a decade earlier under very different market and economic conditions. Decker produced and sold all of the coal it was allowed to sell to ComEd under the 1974 contract and paid the State of Montana all coal taxes due based on these prices. Decker argues that DOR made no attempt to support its position with evidence that there were any contracts negotiated under the "market and economic" conditions existing in 1986-1988 at prices higher than what Decker received under the Montana Contracts. Absent Decker's sales of coal to Big Horn and Black Butte under the Montana Contracts, the coal in question would have been sold in the same market at the same or lower prices to another consumer, or perhaps it would have remained in the ground for lack of another buyer.

¶28 Decker argues that STAB failed to make any factual findings to support DOR's imputed price of $24-$28 per ton as "market value" under the legal standard established by Judge Baugh. To the contrary, Decker asserts it had no opportunity, during the period in question, to sell this coal for the $24-$28 per ton prices that DOR has imputed.

The District Court's Conclusions:

¶29 After determining that substantial evidence supported DOR's decision that the transactions were not arm's-length, the District Court concluded that

> The only market for Decker's coal was Commonwealth Edison. Commonwealth Edison was the only relevant market because the "Wyoming Contracts" sales were contingent upon the contemporaneous sale of Decker's coal to Commonwealth Edison. The contracts did not permit either Black Butte or Big Horn to sell coal to anyone other than Commonwealth Edison. This closed market (Commonwealth

Edison) was the market condition at the time of sale. . . . Therefore, the market value of coal was approximately $24-$27 a ton, the price of the coal under the Commonwealth Edison contracts. [Citations omitted.]

## *Discussion*

¶30 Under § 15-35-107, MCA, DOR may impute a value to coal sales rather than rely on contract prices if: (1) it determines the contract price does not represent an arm's-length agreement, and (2) the imputed value approximates market value. Judge Baugh, in his interlocutory order, defined market value as: "The term 'market value' as set forth in Sec. 15-35-107(1) and (3), M.C.A., means the price that a willing buyer would pay to a willing seller under the market and economic conditions at the time of the sale." This definition, which is not disputed, by its terms requires a determination of what a willing buyer would pay to a willing seller under a contract negotiated under the market and economic conditions prevailing as of 1986-1988.

¶31 The only evidence presented as to what a willing buyer would pay to a willing seller pursuant to a contract negotiated in 1986-1988 was in the Sansom Report prepared by Decker's expert, Dr. Robert L. Sansom. The Sansom Report documents transactions and bids for coal comparable in quality and in time to the Montana Contracts. The Sansom Report shows that coal sales in Decker's market area, which reflected the market and economic conditions prevailing at the time of the sale, ranged from $3.77 to $7.61 per ton. The Sansom Report took into account both short term (spot market) contracts and long term contracts negotiated in the same time frame as Decker's 1986-1988 contracts with Big Horn and Black Butte. Although DOR did not agree with Dr. Sansom's conclusion that the Montana Contracts were at market value, it does not disagree with any of the data or other factual recitations contained in the report as to what coal was selling for from 1986 to 1988. Further, DOR did not present any evidence that coal contracts were entered into from 1986 to 1988 at prices that differed from those enumerated in the Sansom Report. The coal prices ($7.50 to $10.42 per ton) under the Decker/Black Butte and Decker/Big Horn contracts were equal to or greater than the coal prices set forth in the Sansom Report ($3.77 to $7.61 per ton). There being no evidence to the contrary, we conclude that the prices paid to Decker by Black Butte and Big Horn under the Montana Contracts met or exceeded market value, in other words, the price that a willing buyer would pay to a willing seller under market and economic conditions *at the time of the sale*.

¶32 The District Court concluded that the only relevant market was ComEd. However, the

agreed upon definition of "market value" does not distinguish between an open and a closed market. Rather, the plain language of the definition refers to the price that a willing buyer would pay to a willing seller under the market and economic conditions at the time of the sale. We conclude that market value is established by the Sansom Report's undisputed documentation of coal sales from 1986 to 1988. Secondly, the fact that the parties made the sale of coal under the "Montana Contracts" contingent upon the contemporaneous sale of the coal to ComEd does not change the fact (shown by the Sansom Report) that there was a market for the sale of coal to buyers other than Black Butte or Big Horn. This was not a "closed market" situation where the customers (Black Butte and Big Horn) could not turn elsewhere to purchase or outsource the coal. *Compare* Palmer v. Columbia Gas of Ohio, Inc. (6th Cir. 1973), 479 F.2d 153, 163 (recognizing "closed market[s] where the customer cannot turn elsewhere to purchase the services or products offered"). The fact that ComEd was bound to purchase coal from Black Butte and Big Horn was attributable to ComEd's 1974 contracts, not to the 1980s Montana Contracts. We conclude that the District Court erred in concluding that ComEd's 1974 contracts defined the relevant market for the purpose of determining market value with regard to the Montana Contracts. ComEd's obligations under the 1974 contracts do not define "market and economic conditions at the time of sale" for willing buyers and sellers of coal in Montana during the 1980s.

¶33 Moreover, the $24-$28 per ton price imputed by DOR ignores the temporal component of the market value definition. DOR's imputed price is erroneously pegged to the 1974 ComEd contracts rather than to any market factors extant "at the time of the sale." The fallacy of DOR's position is apparent from the expert report submitted by DOR's expert, Dr. Ronald Johnson, whose report was not a market value study but rather an overview of long-term coal contracting. Dr. Johnson recognized that the market and economic conditions existing when the 1974 ComEd Contract was negotiated differed from the market and economic conditions between 1986 and 1988 when the Montana Contracts were negotiated. He also recognized that the coal prices that Decker received from ComEd from 1986 to 1988 were based upon price escalators pre-determined back in 1974 and that those escalators "did not do a very good job of tracking new contract prices of the mid and late 1980s" and "were not design[ed] to closely follow changes in the market price for coal, however defined."

¶34 Dr. Johnson's observations are borne out by the Stagg Report, which was commissioned by the State of Montana's Department of Commerce. Stagg Engineering was retained by the Department of Commerce to conduct a study and assessment of the

future market demand for Montana coal production and related topics. The results of the study were published in January, 1996 for the Montana Department of Commerce and the Office of the Governor, Economic Development Office. The report provides, in part:

> The Decker mine is facing several critical issues related to sales to both Detroit Edison and Commonwealth Edison. . . . Of much greater economic importance to Decker profitability and future State tax revenues, however, are the prices embodied in the long-term contracts for both utilities. The Consultant's analysis, as well as abundant anecdotal evidence and observations by utility industry analysts, indicate that the current contract prices are significantly above market, by a factor of 50% in the case of Detroit Edison and as much as 300% for Commonwealth Edison.
>
> ¶35 The 1996 Stagg Report does not specifically reference the 1986-1988 time frame at issue here. Nonetheless, it graphically illustrates the fact that contract prices based upon pre-determined escalators, which were negotiated years ago in long-term contracts, do not accurately reflect present-day market value.

¶36 As Decker points out, the illogic of DOR's position is further illustrated by reversing the price differential between the 1970s and 1980s contracts at issue. Had coal prices *increased* from the 1970s time period instead of decreasing, the coal prices under the 1980s contracts would exceed the prices from the 1970s contracts. Under DOR's rationale, DOR would ignore the higher negotiated market price in the 1980s and assess taxes based upon the lower prices negotiated in the 1970s. This would unfairly and illogically deprive the State of tax revenue by freezing tax assessments at 1970s levels. When coal prices decrease, as they did in the 1980s, it is equally illogical to assess the 1980s production of coal at the higher 1970s prices. Both logic and law dictate that the assessment be based upon market value *at the time of the sale*.

¶37 We find unpersuasive DOR's arguments that Decker's 1974 contract with ComEd should determine the market value of coal sold under the Montana Contracts. DOR contends that the 1974 ComEd Contract is relevant to the determination of market value for the Montana Contracts because the price of coal under that contract could not be determined until the coal was actually sold by Decker in the 1980s. That is, the price at which coal is sold under the long-term contracts is determined at or near the time of sale. This is true. However, this contention ignores the fact that the price paid for coal in the 1980s pursuant to long-term contracts is determined, not by reference to market and economic conditions extant in the 1980s, but by reference to escalators pre-determined in the 1970s that were not designed to track current market value. DOR's contention that the

1970s long-term contract prices, when implemented in the 1980s according to predetermined escalators, are "at the time of sale," is untenable.

¶38 DOR further argues that its reliance upon the 1974 ComEd Contract is compelled because that contract establishes the price for the same coal being shipped to ComEd on the same train as the Decker/Big Horn and Decker/Black Butte coal in dispute. Thus, posits DOR, it was comparing "apples to apples." This argument ignores the fact that coal, like apples, can be an interchangeable commodity in the sense that one train load may contain a sufficient quantity of coal to satisfy numerous contracts entered into at different times and for different prices. Decker did not use the coal mined pursuant to the Black Butte and Big Horn contracts to satisfy Decker's 1974 contract obligation to ComEd. As Decker points out, the Black Butte and Big Horn coal, although transported on the same train as the Decker/ComEd coal, was "new coal." That is, Decker had already satisfied its contract with ComEd. The Black Butte and Big Horn contracts thus represent coal that Decker was mining above and beyond any coal that Decker needed to satisfy its ComEd contract. The fact that it was the "same coal" in terms of quality and source does not mean that it was the same coal that was being shipped to satisfy the 1974 ComEd Contract, nor does it mean that Decker was somehow precluded from negotiating new sales of that coal at different prices reflecting the market and economic conditions "at the time of the sale."

¶39 In support of its reliance on the 1974 ComEd Contract, DOR invokes § 15-35-107(3), MCA, which states:

> (3) When imputing value, the department may apply the factors used by the federal government under 26 U.S.C. 613, or that provision as it may be labeled or amended, in determining gross income from mining or the department may apply any other or additional criteria it considers appropriate.

> ¶40 In turn, the federal regulation interpreting 26 U.S.C. § 613 provides as follows:

Sales or purchases, including the taxpayer's, of ores or minerals of like kind and grade as the taxpayer's, will be taken into consideration in determining the representative market or field price for the taxpayer's ore or mineral only if those sales or purchases are the result of competitive transactions.

26 C.F.R. § 1.613-4(c)(3) (1972).

¶41 Thus, DOR contends, it had leeway to consider Decker's "own actual sales prices for

ores or minerals of like kind and grade." Although the above regulation clearly allows consideration of the taxpayer's own sales of ores of like kind and grade, it does not suggest that the taxpayer's own actual sales, *regardless of date and price*, shall be determinative of current market value. Rather, the regulation is couched in terms of ascertaining a "representative" market. For purposes of resolving the issue under consideration, a "representative" market is one that reflects market value "at the time of the sale."

¶42 Decker's sale of coal to ComEd pursuant to a 1974 contract with pre-determined escalators is not representative of the market and economic conditions at the time of the sale and thus does not meet the controlling definition of market value.

¶43 DOR and STAB's conclusion that the 1974 ComEd Contract price represents the price that a willing buyer would pay to a willing seller under the market and economic conditions at the time of the 1980s sales is incorrect. We conclude that Decker has shown that DOR's imputed value of $24-$28 per ton does not "approximate[ ] market value f.o.b. mine," § 15-35-107(1), MCA, under the market and economic conditions pertaining in 1986-1988.

¶44 The decision of the District Court, affirming STAB, is reversed and DOR's assessment based upon the imputed value of $24-$28 per ton is hereby dismissed.

/S/ W. WILLIAM LEAPHART


We concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ KARLA M. GRAY

/S/ JIM REGNIER

Justice William E. Hunt, Sr., dissenting:

¶45 The majority has elevated form over substance in accepting Decker's contentions. As

the DOR ironically frames the question presented: How can this coal be worth the values of $7 to $10/ton claimed by Decker and its expert when it is <u>simultaneously sold</u> to Commonwealth for $24 to $29/ton? The plain answer to that question is that it can only be attributed the lesser value, as the majority has done here, by ignoring the economic realities of the transactions at issue. I dissent because I agree with the DOR that artificial prices between companies that share common management and ownership do not accurately reflect the true value of coal upon which coal production taxes are based. Rather, the best indicator of value for Montana coal production tax purposes is the <u>actual prices paid</u> for the coal in question, as determined by the long-term contracts underlying the transactions. As discussed below, I conclude that the DOR has satisfied both prongs of the conjunctive test for imputing a taxable value to coal sales and, therefore, that the DOR's assessments should be affirmed.

## 1. The Montana Contracts Were Not Arms-Length Transactions

¶46 The majority does not address whether the Montana Contracts were arms-length transactions. It is crucial to address this prong, however, because the DOR's imputed value follows entirely from this starting premise. As defined by Judge Baugh, an "arms-length" transaction is an agreement (1) between independent (2) non-controlled parties (3) with opposing economic interests. Looking at the record as a whole, it is clear that the Montana Contracts were not arms-length. Being non-arms-length, the contract prices paid to Decker by Big Horn and Black Butte simply were not representative of "market value" as contemplated by Montana law.

¶47 First, the Kiewit Companies were not independent of one another. Kiewit owned all or part of Decker, Big Horn, and Black Butte. Decker claims that notwithstanding Kiewit's ownership interests in all three subsidiary companies, the Montana Contracts were arms-length by virtue of the fact that the agreements were negotiated by a representative of Kiewit on behalf of Big Horn and Black Butte and by a representative of NERCO on behalf of Decker. However, as the Department argues and as STAB found, such "negotiation" is insufficient to render the Montana Contracts arms-length, since the respective "negotiators" were shown to both be members of the Decker Management Committee. In other words, a member of the Decker Management Committee "negotiated" with another member of the Decker Management Committee to sell Decker coal. These "negotiations" were nothing more than Decker negotiating with itself for the sale of Decker coal with Decker approving what was "negotiated."

¶48 Second, the Kiewit Companies were jointly controlled. Not only is Kiewit's overlapping ownership of all three subsidiary entities strongly indicative of control, *see* Creme Mfg. Co. v. United States (5th Cir. 1974), 492 F.2d 515, 520, but the record shows that Kiewit controlled the day-to-day management and operational responsibilities of Decker, Big Horn, and Black Butte. Additionally, Kiewit filed a combined Montana Corporation License Tax return for all three subsidiary entities indicating that they were engaged in a unitary business. *See* Allied-Signal, Inc. v. Director, Div. of Taxation (1992), 504 U.S. 768, 781, 112 S.Ct. 2251, 2260, 119 L.Ed.2d 533, 548 (indicating that objective indicia of a "unitary business" are (1) functional integration, (2) centralization of management, and (3) economies of scale). Kiewit's filing of a unitary tax return is, by itself, an admission that Decker, Big Horn, and Black Butte were jointly controlled.

¶49 Third, the Kiewit Companies did not have opposing economic interests. Although Decker claims that NERCO's participation in the negotiation of the Montana Contracts ensured that Decker received the highest price for its coal, this fact does not magically render the transactions the result of opposing economic interests. It is too simple a point to belabor here, but all of the parties to the Montana Contracts, including NERCO, had the same economic interest of selling more Decker coal. Put simply, everyone stood to profit by the Montana Contracts. This was especially true of Kiewit: not only would ComEd pay Kiewit under the lucrative long-term Big Horn and Black Butte contracts without diminution by the Wyoming coal severance tax, but Kiewit would also be paid for the additional Decker coal that was mined with Decker, as it turns out, being taxed only on the lower face value of the Montana Contracts.

## *2. The Value Imputed to the Montana Contracts Was Market Value*

¶50 As the DOR discovered in auditing Decker, the obligations of Big Horn and Black Butte to purchase Decker coal under the Montana Contracts were totally contingent upon two things: first, Big Horn and Black Butte had <u>no right</u> to purchase Decker coal under the Montana Contracts until Decker had satisfied its monthly delivery obligations to ComEd pursuant to the 1974 contract; and second, Big Horn and Black Butte had <u>no obligation</u> to purchase Decker coal under the Montana Contracts unless ComEd was purchasing coal pursuant to the Wyoming Contracts.

¶51 In other words, the Montana Contracts were clearly ancillary to and contingent upon the preexisting long-term contracts. While the Montana Contracts were not arms-length, it is undisputed that the 1970s long-term contracts between ComEd and the Kiewit

Companies were arms-length agreements negotiated between a willing buyer and seller. Therefore, nothing should prevent the DOR from piercing the sham Montana Contracts and reaching the true value of the underlying, arms-length transactions.

¶52 The DOR is permitted to impute a value to coal when a party (1) sells coal under a contract which is not an arms-length agreement, and (2) the contract price is below market value. *See* §§ 42.25.512 (1)(b) and 42.25.1708 (1)(b), ARM. Here, having determined that the Montana Contracts were not arms-length agreements, the DOR then correctly determined that the sham contract prices were below "market value" as determined by the price provisions of the underlying long-term contracts at the time of sale.

¶53 The DOR satisfied all three requirements implicit in Judge Baugh's definition of market value: (1) that the price a "willing buyer" (ComEd) would pay a "willing seller" (Kiewit) was $24-$28/ton; (2) that the "market and economic conditions" for the Decker coal at issue were defined by the 1970s long-term contracts between the Kiewit Companies and ComEd; and (3) that the price provisions (base price + escalators) of the long-term contracts determined the price "at the time of sale" for Decker coal sold to ComEd during the 1980s.

¶54 First, the DOR's imputed value of $24-$28/ton was equivalent to the actual prices paid for Decker coal by ComEd under arms-length agreements. In implementing its broad authority under § 15-35-107(3), MCA, the DOR did not, contrary to Decker's suggestions, rely solely on the 1974 long-term contract between Decker and ComEd as the basis for its imputation. While the DOR did initially look to that contract in defining the relevant market value for Decker coal, which it is entirely justified in doing under 26 U.S.C. § 613 and 26 C.F.R. § 1.1613-4, the DOR went further and compared the value of Decker coal sold under the 1974 contract with the value of Decker coal sold under the Wyoming Contracts to verify the accuracy of its imputed value.

¶55 This inquiry showed that Decker, Big Horn, and Black Butte were each selling Decker coal to ComEd during the audit period at <u>substantially similar prices</u> as determined by the arms-length long-term contracts: Decker was receiving $26.79 to $28.04/ton under its 1974 contract, while Big Horn and Black Butte were receiving $23.71 to $29.47/ton under the 1976 Wyoming Contracts. Therefore, the DOR's imputed value of approximately $24-28/ton was obviously based on the prices paid to the Kiewit Companies by ComEd under <u>all three long-term contracts</u>, not just the 1974 Decker/ComEd contract. This methodology was an entirely appropriate use of the DOR's authority, under § 15-35-107, MCA, to

utilize "other criteria" in arriving at an imputed value. *See* § 15-35-107(3), MCA (specifying that the DOR may utilize the factors enumerated in 26 U.S.C. § 613 or "may apply any other or additional criteria it considers appropriate").

¶56 Given that the DOR's imputed value of $24-$28/ton represents the actual prices paid by ComEd during the audit period for the Decker coal at issue, Decker cannot refute the DOR's imputation. Decker has simply failed to sustain its burden of proving that the imputed value for the coal at issue does not approximate market value. *See* § 15-35-107 (3), MCA. Since the underlying long-term contracts were arms-length, those contract prices therefore represent the amounts a willing buyer would pay a willing seller for the Decker coal at issue.

¶57 Second, the 1970s contracts defined the "market and economic conditions" for the sale of Decker coal during the audit period. Decker contends, and the majority accepts, that coal is an entirely fungible substance. The majority goes awry by assuming, erroneously, that there is a single market value for coal and, consequently, that the value of long-term coal contracts negotiated under markedly different market conditions can be judged according to current market conditions for coal contracting. Not only does this position fail to acknowledge the public policy underlying Montana's coal severance tax, but it leads to an absurd legal result.

¶58 As the DOR suggests, the primary legislative purpose underlying Montana's coal severance tax was to establish "categories of taxation which recognize <u>the unique character of coal as well as the variations found within the coal industry</u>." Section 15-35-101(2)(d), MCA (emphasis added). In enacting the coal severance tax, the Montana Legislature found that "while coal is extracted from the earth like metal minerals, there are differences between coal and metal minerals" justifying different treatment for taxation purposes. Section 15-35-101(1), MCA. These differences, as expressly found by the legislature, include the fact that "coal is the only mineral which is <u>so often marketed through sales contracts of many years' duration</u>" (§ 15-35-101(1)(b), MCA); that "coal, unlike most minerals, <u>varies widely in composition and consequent value when marketed</u>" (§ 15-35-101(1)(c), MCA); and that different types of coal "in Montana have <u>sufficiently different markets and value</u> and therefore require different production taxes" (§ 15-35-101(1)(e), MCA) (emphases added).

¶59 As a general rule, the public policy of this state is set by the Montana Legislature through its enactment of statutes. Duck Inn, Inc. v. Montana State Univ. (1997), 285

Mont. 519, 523-24, 949 P.2d 1179, 1182. The public policy underlying Montana's coal severance tax recognizes the unique character of coal as a mineral substance, the different markets and values which exist for different types of coal, and the prevalence of long-term contracting in the coal industry as a means of ensuring a coal supply of a particular grade or quality. If the Montana Legislature has expressly recognized variations in coal quality and consequent value, and the prevalence of long-term contracting in the coal industry because of these variations, nothing should prevent the DOR from recognizing the same and imputing a value to a long-term contract based upon actual sales prices where, as here, that contract specifies coal of a particular quality and provides for a price at the time of sale.

¶60 Decker's sale and delivery of coal was, by the very terms of the Montana Contracts, contingent upon Black Butte and Big Horn being able to "contemporaneously sell and deliver" an identical quantity of Decker coal to ComEd pursuant to the Wyoming Contracts; and that coal had to be of a <u>specific quality</u> under the terms of the Montana Contracts (contractually specified BTU, ash fusion temperatures, and specific percentages of moisture, volatile matter, fixed carbon, ash, sulphur, and sodium), which identically parallel the highly specific coal quality provisions of the 1974 Decker/ComEd contract. Although the Wyoming Contracts themselves are not in the record, they presumably contain the identical coal quality provisions. Indeed, the Johnson Report suggests that one of the reasons for the Montana Contracts was because Big Horn and Black Butte were having trouble supplying coal of the particular quality mandated by the Wyoming Contracts at a reasonable extraction cost.

¶61 Notably, Decker cites no sales of <u>Decker coal</u> (by Decker, Big Horn, or Black Butte) during the audit period other than the sham sales made to its companion Kiewit companies under the Montana Contracts. Decker's hypothetical argument that it could have sold its coal to other willing buyers under market conditions in the 1980s begs the question: What reasonable coal company would undercut its profit potential by selling on the open market when it could enter into an intra corporation sale which is tied to preexisting long-term contracts with higher prices? Put simply, it strains good faith to assume that Decker would be a "willing seller" on the open market when it already had a "willing buyer" in ComEd who would pay significantly higher prices than dictated by existing market conditions. The District Court was correct in determining that this was, in effect, a "closed market" situation.

¶62 In that respect, the Sansrom Report, upon which the majority relies, is simply

irrelevant. The Sansrom Report is a description of the 1980s market for spot contracts and new long-term contracts, however, it cites no sales of <u>Decker coal</u> during the audit period. In essence, what Decker is arguing by relying on the Sansrom Report is that evidence of other 1980s prices for coal <u>not mined from Decker and not sold to ComEd</u> provides better evidence of the value of the Decker coal at issue than the actual value of Decker coal sold to ComEd during the audit period. This is an absurd position.

¶63 Contrary to the majority's reasoning, judging sales of Decker coal under the Montana Contracts by sales of coal of other quality and value suffers, as the DOR justifiably asserts, from an "apples-to-oranges" comparison. The Johnson Report clearly articulated that, "coal is not a homogeneous commodity" since it "varies greatly in terms of its BTU content and other physical properties, and power plants are designed to burn certain types of coal." Remember that the value of coal, unlike other minerals, varies dependent upon its composition. Section 15-35-101(1)(c), MCA. Therefore, as compelled by the federal Clean Air Act, a major factor underlying the prevalence of long-term contracting between a utility company like ComEd and a low-sulphur western mine like Decker is, in fact, the <u>heterogeneous nature of coal</u>. The majority's simplistic analysis on the basis of the Sansrom Report is fallacious because, as the Johnson Report stated, it "completely ignores the economic rationale for long-term contracts between coal suppliers and utilities, a dominant feature of the coal market, especially in the Western United States during the 1970s and 1980s."

¶64 Furthermore, the apparent "illogic" of the DOR's position, as suggested by Decker and accepted by the majority, is an obvious red herring. The inverse situation would never arise. Keep in mind that the underlying long-term contracts here were arms-length and that the DOR's imputation flows from the fact that the surface Montana Contracts were not arms-length. Therefore, assuming that the long-term contract is an arms-length agreement, as here, the DOR would never be in a position to impute a different value to that contract under the conjunctive test for approximating market value. Without any evidence that the agreement was non-arms-length, the contract sales price would be determinative of the taxable value of that coal even if the contract price were significantly below current market value. *See* §§ 15-35-102(7), 15-35-103(2), and 15-35-107(1)(c), MCA. However, where, as here, the contract price is non-arms-length and totally contingent upon contemporaneous sales of the same coal under a lucrative long-term contract, the DOR should be entitled to pierce the sham contract price and tax the true value of the underlying transaction.

¶65 Third, the long-term contracts specify a contemporary sales price according to a base price and predetermined escalators which are calculated "at the time of sale." That these contracts were not designed to closely follow changes in the price of spot market and new long-term contracts is immaterial unless one ignores coal's variability in composition and market value, and the economic rationale for long-term coal contracts. Pursuant to the price provisions of the underlying long-term Decker/ComEd contract, the base price together with the price adjustments under the predetermined escalators constitute the " 'current price' or 'current per ton price.' " If that were not sufficient evidence that the underlying long-term contracts contain a temporal dimension sufficient to satisfy the definition of market value, Kiewit itself represented to the United States Securities and Exchange Commission that "[t]he price at which coal is sold under the Company's long-term contracts is determined at or near the time of sale . . . ." Plainly, the time of "sale" occurred during the 1980s when Decker coal was loaded on the train f.o.b. at the Decker mine for delivery to ComEd, not in the 1970s when the long-term contracts were entered into.

¶66 Given the legislative findings on the purpose of taxing coal differently from other minerals (i.e., because of variations in coal quality, value, and markets) and the DOR's broad authority in imputing value, nothing under Montana law prohibits the DOR from recognizing that long-term contracts strictly specifying coal of a particular quality and providing for a contract price determined at the time of sale, such as here, are directly representative of the relevant market value for that particular coal. Indeed, the DOR's assessments not only approximate market value; they constitute market value. I would affirm because there is no better approximation of market value than the actual prices paid for the coal at issue.

### Concluding Remarks

¶67 The law is supposed to respect substance above form. Section 1-3-219, MCA. After today, however, other vertically integrated mining companies that hold lucrative long-term coal contracts and do business in Montana now possess, thanks to Kiewit's ingenious legal shell game and the majority's formalistic holding, a paradigm for avoiding being taxed on the true value of their long-term contracts. By simply arranging for a sham spot market or new long-term coal contract between subsidiaries at prices slightly above current market value, a parent company, like Kiewit, can reap massive profits on underlying long-term coal contracts while paying relatively minimal taxes on the mock value of the surface contract. Provided that such a transaction is structured to be at least equivalent to current

market value for spot market and new long-term coal contracts, the transaction will only be taxable at the contract sales price regardless of whether the agreement was non-arms-length.

¶68 In short, the majority has accepted Decker's following argument, and its absurd consequences, lock-stock-and-smoking-barrel: "[The] ownership interests of Kiewit potentially affects only whether the Montana Contracts were arm's length agreements. Even if these agreements are determined not to be arm's length agreements, Montana law does not allow the Department to impute a price above the market price for coal." The majority, by treating coal as an entirely fungible substance with a single market value, has effectively reduced the two-pronged test for approximating market value to a single inquiry: Does the new contract price, irrespective of whether it is tied to existing long-term contracts with substantially higher prices, match or exceed current market value for other new contracts? If so, then the DOR cannot impute a different value to that contract, even where, as here, the contract price is plainly the product of a sham, intracorporation transaction. I dissent; today's absurd decision dupes the State of Montana and its citizens out of over $50 million in rightful tax revenues and that may be only the beginning.

/S/ WILLIAM E. HUNT, SR.

Justice Terry N. Trieweiler concurs in the foregoing dissent.

/S/ TERRY N. TRIEWEILER